**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MARTHA WARD, on behalf of
herself and all others similarly
situated,

    *Plaintiff-Appellee,*

    v.

DIXIE NATIONAL LIFE INSURANCE
COMPANY; NATIONAL FOUNDATION
LIFE INSURANCE COMPANY,

    *Defendants-Appellants.*

SOUTH CAROLINA DEPARTMENT OF
INSURANCE; RONALD DANIEL
ROTUNDA,

    *Amici Supporting Appellants.*

No. 08-2378

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Joseph F. Anderson, Jr., District Judge.
(3:03-cv-03239-JFA)

Argued: December 1, 2009

Decided: February 8, 2010

Before TRAXLER, Chief Judge, and WILKINSON and
MICHAEL, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Chief Judge Traxler and Judge Michael joined.

---

## COUNSEL

**ARGUED**: Kenneth W. Starr, KIRKLAND & ELLIS, LLP, Los Angeles, California, for Appellants. Richard Harpootlian, RICHARD A. HARPOOTLIAN, PA, Columbia, South Carolina, for Appellee. **ON BRIEF:** Susan E. Engel, Elizabeth M. Locke, KIRKLAND & ELLIS, LLP, Washington, D.C.; J. Calhoun Watson, Jr., SOWELL GRAY STEPP & LAFFITTE, LLC, Columbia, South Carolina; C. Allen Foster, Kevin E. Stern, Robert P. Charrow, GREENBERG TRAURIG, LLP, Washington, D.C., for Appellants. Graham L. Newman, RICHARD A. HARPOOTLIAN, PA, Columbia, South Carolina; Tobias G. Ward, Jr., TODD & WARD PC, Columbia, South Carolina, for Appellee. Jeffrey A. Jacobs, SOUTH CAROLINA DEPARTMENT OF INSURANCE, Columbia, South Carolina, for South Carolina Department of Insurance, Amicus Supporting Appellants. Professor Ronald D. Rotunda, CHAPMAN UNIVERSITY SCHOOL OF LAW, Orange, California, for Ronald Daniel Rotunda, Amicus Supporting Appellants.

---

## OPINION

WILKINSON, Circuit Judge:

This case began as a relatively straightforward class action suit for breach of contract. Martha Ward and other policyholders in the state of South Carolina (collectively, "plaintiffs") sued insurance companies National Foundation Life Insurance Company ("National") and Dixie National Life Insurance Company ("Dixie") (collectively, "defendants").

Plaintiffs alleged that defendants violated their contractual promise under the insurance policies to pay policyholders the "actual charges" of cancer treatments. The dispute centered on the proper meaning of "actual charges": Plaintiffs contended that the phrase meant the full amount a medical provider billed patients for its services, while defendants argued that it meant the lesser amount a medical provider received as payment from insurers for its services.

After several procedural twists and turns, the question reached this court, and in a previous decision, we adopted plaintiffs' definition of "actual charges." *Ward v. Dixie Nat'l Life Ins. Co.*, 257 Fed. Appx. 620 (4th Cir. 2007) (per curiam). Shortly thereafter, however, the South Carolina legislature enacted a statute adopting, in effect, defendants' definition. On this latest appeal, defendants ask us to reverse the trial court, apply the freshly enacted statutory definition to this case, and overturn our prior decision. Because doing so would undermine the presumption against statutory retroactivity and raise constitutional concerns, we decline defendants' invitation. Defendants also raise a number of other issues regarding class certification and the calculation of damages, but we likewise find these arguments without merit. Accordingly, we affirm.

## I.

All the class members in this case, including lead plaintiff Martha Ward, are South Carolina residents who hold supplemental cancer insurance policies with defendants. The insurance policies, which were initially issued by Dixie and later assigned to National, obligate the insurer to pay its policyholders the "actual charges" of any covered cancer treatments they undergo, in exchange for policyholders' regular premium payments. As "supplemental" insurance, the terms of the policies require defendants to make payments of "actual charges" directly to policyholders, not to medical providers. Medical providers often are paid for their services not by defendants

but by primary insurers, such as Blue Cross or Medicare. In this case, because many of the plaintiffs had both supplemental and primary insurance, they received payments for the value of their cancer treatments even though they were not paying out-of-pocket for those treatments. In this sense, the supplemental cancer policies serve, as defendants explained in letters to policyholders, to "provid[e] financial protection against the catastrophic effects of health care costs."

The policies do not define "actual charges." For the years immediately following the policies' issuance, Dixie, and then National, paid "actual charges" based on the amount a medical provider charged for its services, usually as reflected in the medical provider's bill to its patients. This amount is usually greater than the amount actually received by medical providers as payment for their services. This is because medical providers frequently enter into pre-negotiated agreements with primary insurers in which they agree to accept a discounted amount as payment-in-full for their services (or, in the case of Medicare, are required under federal law to accept a discounted amount as payment-in-full for their services). The discounted amount paid to medical providers is shown on explanation of benefits (EOB) statements and on Medicare forms.

In late 2001 or early 2002, National changed its payment practice. Instead of basing "actual charges" on the full list price of healthcare services, it began basing "actual charges" on the lesser payment medical providers received. Its policyholders were not pleased. In March 2003, one policyholder, Martha Ward, sued defendants in South Carolina state court, claiming that by paying "actual charges" in the discounted amount, defendants had breached the insurance contracts. In response, defendants removed the action to federal court on the basis of diversity jurisdiction.

The United States District Court for the district of South Carolina certified a statewide class of plaintiffs, which con-

sisted of all South Carolina residents "insured during the class period under cancer policies from defendant Dixie National Life Insurance Company, sold in South Carolina, where Dixie promised to pay . . . 'actual charges.'" Soon thereafter, both parties filed motions for summary judgment, and the district court initially granted summary judgment in favor of defendants.

Plaintiffs appealed the district court's judgment, and this court held that the phrase "actual charges," as used in plaintiffs' insurance policies, was patently ambiguous, and that under South Carolina law, that ambiguity had to be resolved in favor of the insured. *Ward v. Dixie Nat'l Life Ins. Co.*, 257 Fed. Appx. 620, 625-27 (4th Cir. 2007) (per curiam) (hereinafter, "*Ward I*"). Accordingly, this court adopted plaintiffs' definition of actual charges: the amount billed by a medical provider for a service, even if that amount is not the same as the amount paid for the service by insurers. *Id.* at 625. This court in *Ward I* thus remanded the case back to the district court with instructions to enter summary judgment in favor of plaintiffs on their breach of contract claim. *Id.* at 630.

In response to *Ward I*, and before the district court could follow this court's instructions on remand, the South Carolina state legislature took action. It enacted a statute defining "actual charges" for all insurance policies of the type at issue here: supplemental disease policies that do not otherwise define the term. S.C. Code Ann. § 38-71-242(B). The definition adopted by the state legislature was, in effect, that advocated by defendants and rejected by this court in *Ward I*. The statute defines "actual charges" as the amount a medical provider accepts as payment-in-full for its medical services, whether by pre-negotiated agreement with a third-party insurer or by operation of law in the case of Medicare. *Id.* § 38-71-242(A)(1)(a) & (b). The statute further states:

> Notwithstanding any other provision of law, after the effective date of this section, an insurer . . . shall not

> pay any claim or benefits based upon . . . actual charges . . . in an amount in excess of the . . . "actual charges" . . . as defined in this section.

*Id.* § 38-71-242(C). The effective date of the statute was June 4, 2008.

In light of the new legislative landscape, defendants moved for judgment on the pleadings, arguing that the statute prohibited them from paying "actual charges" as defined in *Ward I*. The district court, however, denied their motion, holding that the new statute did not apply retroactively to this lawsuit. The court rested its holding on the presumption against statutory retroactivity, under which a statute does not apply retroactively unless the legislature clearly and explicitly expresses an intent that it do so. In this case, the court did not find the necessary clear and explicit intent, stating that "[n]othing in either the legislative history or the language of § 38-71-242 unambiguously indicates that the statute is to be applied retroactively."

Consequently, the district court determined that it was bound to use this court's definition of "actual charges" in *Ward I* in lieu of the statutory definition. The district court proceeded to follow this court's instructions to enter summary judgment in favor of plaintiffs and subsequently entered an order awarding plaintiffs nearly $8 million in damages. Attached to the order was a calculation of damages for each of 182 class members, each of whom was a policyholder whose policy contained the contested language clarified by the decision in *Ward I*. Defendants now appeal.

II.

Defendants' primary contention on appeal is that the district court erred in refusing to apply the South Carolina statute's definition of "actual charges" in this case. For the reasons explained below, we disagree.

### A.

Both federal and South Carolina courts employ a robust presumption against statutory retroactivity. *See, e.g.*, *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994); *Jenkins v. Meares*, 394 S.E.2d 317, 319 (S.C. 1990). Under this presumption, courts assume that statutes operate prospectively only, to govern future conduct and claims, and do not operate retroactively, to reach conduct and claims arising before the statute's enactment. *See, e.g.*, *Landgraf*, 511 U.S. at 265, 269-70; *Jenkins*, 394 S.E.2d at 319. Since legislatures generally intend statutes to apply prospectively only, this rule of statutory construction is a means of giving effect to legislative intent. *See Rivers v. Roadway Exp., Inc.*, 511 U.S. 298, 304-05 (1994).

Although only a presumption, "the presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic." *Landgraf*, 511 U.S. at 265. It has been described as "[a]mong the most venerable of the[ ] [judicial] default rules," *Tasios v. Reno*, 204 F.3d 544, 549 (4th Cir. 2000), a "time-honored presumption," *Hughes Aircraft Co. v. U.S. ex rel. Schumer*, 520 U.S. 939, 946 (1997), and a "rule of general application." *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 37 (2006) (citation and internal quotations omitted).

When determining whether the presumption against retroactivity bars the application of a statute in a given case, courts perform a three-step analysis. *See Landgraf*, 511 U.S. at 280. First, a court must "determine whether [the legislature] has expressly prescribed the statute's proper reach." *Id.* If so, "there is no need to resort to judicial default rules," and hence, the presumption against retroactivity does not apply. *Id.* If, however, the legislature has not prescribed the statute's reach, a court must move to step two and "determine whether the new statute would have a retroactive effect" if applied to the case at hand. *Id.* If not, the presumption against retroactivity

again has no application, but if it does, the presumption is triggered, and the court must then inquire under the third step whether the presumption is overcome with "clear congressional intent" in favor of retroactivity. *Id.* Although defendants put up a fight at each of the three steps along the way, we ultimately find their arguments unpersuasive.

1.

Under the first step of the analysis, we must decide whether the South Carolina General Assembly expressly prescribed the reach of the statute. *Id.* For example, the legislature may avoid triggering the presumption against retroactivity by including an explicit provision stating that the statute governs lawsuits already initiated prior to its enactment. *Martin v. Hadix*, 527 U.S. 343, 354 (1999); *see also Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 38 (2006) (finding no express prescription absent "any clause expressly dealing with" conduct before the effective date, either expressly including it within the statute's ambit or expressly excluding it). The standard for express prescription is "a demanding one," requiring prescription that is truly express and unequivocal. *See I.N.S. v. St. Cyr*, 533 U.S. 289, 316 (2001). The South Carolina statute here contains no such express and unequivocal language specifying whether it applies to lawsuits filed before its enactment, such as this one.

Defendants contend, however, that the South Carolina legislature prescribed the statute's reach by expressly applying the statute to "*any* claim or benefits," without limitation and without regard to when those claims or benefits arose. S.C. Code Ann. § 38-71-242(C) (emphasis added). Since this particular litigation concerns "any claim or benefit," defendants argue, the statute applies and the analysis ends there. We think this argument misconstrues the first step of the analysis.

The inquiry under the first step focuses on whether the legislature has expressly prescribed the statute's *temporal* reach,

not merely its substantive reach. *See Martin v. Hadix*, 527 U.S. at 353-54. Thus, if a legislature wishes to avoid triggering the presumption against retroactivity, it may not merely apply the statute to an expansive category of cases. It must instead *expressly not* limit the statute's temporal reach. *See id.* In fact, the Supreme Court in *Martin v. Hadix* rejected a claim virtually identical to defendants'. *See id.* There, petitioners argued that Congress had expressly prescribed the statute's reach by stating that it applied to "*any* action [brought] by a prisoner who [is] confined." *Id.* at 353 (citation and internal quotations omitted) (emphasis in original). The Court held that this language "falls short" of the requisite express directive, because it failed to include "language more obviously targeted to addressing the temporal reach of that [statute]." *Id.* at 353-54. Likewise, here, without a provision clearly delineating the time period to which the statute applies, we do not find that the South Carolina legislature expressly prescribed its reach.

2.

We accordingly proceed to the second step of the retroactivity analysis to determine whether the statute, if applied to this case, would operate retroactively. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994). A statute operates retroactively when it would attach new legal consequences to events occurring prior to its enactment. *Id.* at 269-70. A statute may have retroactive effect in a number of circumstances, including, for example, when the statute "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.* at 280; *see Hughes Aircraft Co. v. U.S. ex rel. Schumer*, 520 U.S. 939, 947 (1997) (explaining that this list is non-exhaustive). This inquiry requires a "commonsense, functional judgment." *Martin v. Hadix*, 527 U.S. at 357.

If applied to this case, the South Carolina statute would operate retroactively. It took effect on June 4, 2008 — at least

six years after defendants' underpayment of "actual charges" to the policyholders gave rise to the suit, about five years after the commencement of the suit, and almost one year after this court resolved the meaning of "actual charges" in *Ward I*. Applying the statute here would reach back to alter the legal consequences of those events taking place before the statute went into effect. Significantly, application of the statute here would disrupt the rights and duties of the parties as adjudicated in *Ward I*.

Defendants attempt to argue that the statute, if applied, would not operate retroactively, since it applies only to *unpaid* claims of insurance benefits. Because the claims here were not paid before the statute's enactment, defendants suggest, the statute does not apply to any conduct or transactions occurring before the statute's enactment. This argument, however, misses the mark. The claims in this case are unpaid only insofar as they are under-paid. Defendants owed plaintiffs "actual charges" at the time plaintiffs underwent the covered cancer treatments and submitted their claims to defendants; the fact that defendants have not yet fulfilled their obligations does not somehow make those obligations unsettled or incomplete. In confronting a similar argument, the Supreme Court, in *Eastern Enterprises v. Apfel*, 524 U.S. 498, 532 (1998) (citation omitted), held that the statute at issue would operate retroactively, even though it "mandates only the payment of future health benefits," because "it nonetheless 'attaches new legal consequences to [an employment relationship] completed before its enactment." Here, too, the South Carolina statute would attach new legal consequences to claims and obligations arising before the statute's June 4, 2008 effective date, even if those claims presently remain unpaid.

3.

Finally, having determined that the presumption against retroactivity is applicable to this case, we must decide under the third step whether the presumption is overcome. *Landgraf*,

511 U.S. at 280. To overcome the presumption against retro-activity, a legislature must clearly demonstrate an intent to apply the statute retroactively. *See id.* This standard is undeni-ably high, requiring an expression of legislative intent that is obvious from the statute's text. *See S.C. Dep't of Revenue v. Rosemary Coin Machines, Inc.*, 528 S.E.2d 416, 418 (S.C. 2000). Usually, legislative history is an insufficient indicia of intent, and courts instead demand "express words evincing an intent that it be retroactive or words necessarily implying such an intent." *Am. Nat'l Fire Ins. Co. v. Smith Grading & Pav-ing, Inc.*, 454 S.E.2d 897, 899 (S.C. 1995) (citation omitted); *see also Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208-09 (1988). The "words used [in the statute must be] so clear, strong, and imperative that no other meaning can be annexed to them, or . . . the intention of the legislature [must be such that it] cannot be otherwise satisfied." *U.S. Fid. & Guar. Co. v. United States*, 209 U.S. 306, 313, 314 (1908). In general, courts will apply a statute retroactively only if "that result is so clearly compelled as to leave no room for reason-able doubt," *Hyder v. Jones*, 245 S.E.2d 123, 125 (S.C. 1978), and will refuse to apply a statute retroactively absent "statu-tory language . . . so clear that it could sustain only one inter-pretation." *Lindh v. Murphy*, 521 U.S. 320, 328 n.4 (1997).

In this case, the South Carolina statute falls quite short of this rigorous standard for overcoming the presumption against retroactivity. Neither the statutory language nor the legislative history evinces any intent to apply the statute's definition to the insurance contracts in this case, and if anything, supports the opposite interpretation. Three considerations require this conclusion. First, the statute states that it has no effect until "*after* the effective date," June 4, 2008. S.C. Code Ann. § 38-71-242(C) (emphasis added). Courts have repeatedly held that the inclusion of an effective date is inconsistent with legisla-tive intent to apply the statute retroactively. *See, e.g.*, *S.C. Dep't of Revenue v. Rosemary Coin Machines, Inc.*, 528 S.E.2d 416, 418 (S.C. 2000); *Pulliam v. Doe*, 142 S.E.2d 861, 863 (S.C. 1965). "A statement that a statute will become

effective on a certain date does not even arguably suggest that it has any application to conduct that occurred at an earlier date." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 257 (1994).

Second, by its own terms, the statute declares that insurers "*shall* not pay any claim" in excess of the statutory definition of "actual charges." S.C. Code Ann. § 38-71-242(C) (emphasis added). The word "shall" typically suggests that the legislature designed the statute to apply only prospectively; "[t]he use of the future tense . . . effectually negatives any suggestion that the statute was intended to apply retroactively." *Link v. Receivers of Seaboard Air Line Ry. Co.*, 73 F.2d 149, 152 (4th Cir. 1934) (citation omitted).

Third and finally, nothing in the statute's legislative history evidences a legislative desire to apply the statute's definition to this case. The South Carolina legislature knew about this particular litigation when it enacted the statute and yet never suggested that the statute apply to it. If the legislature wanted to apply the statute to this case, it could have, should have, and likely would have made that wish more apparent.

Nonetheless, defendants argue that the presumption is overcome here, since the South Carolina General Assembly passed the statute in direct response to *Ward I*. Because the legislature thought *Ward I* was wrongly decided, defendants contend, the legislature necessarily must have wanted to apply the statute on remand in order to overturn *Ward I*. As already discussed, however, this view is unsupported by the statute's text and legislative history. Furthermore, as courts have previously recognized, the mere fact that a legislature enacts a new law in order to correct or clarify a recent judicial decision does not warrant an inference that the legislature intended the new law to apply to the case giving rise to it. *See Rivers v. Roadway Exp., Inc.*, 511 U.S. 298, 304-05 (1994); *Condit v. United Air Lines, Inc.*, 631 F.2d 1136, 1140 (4th Cir. 1980). "The usual purpose of a special interpretive statute is to cor-

rect a judicial interpretation of a prior law which the legisla-
ture determines to be inaccurate. Where such statutes are
given any effect, the effect is prospective only." *Id.* (citation
and internal quotations omitted). Having concluded the three-
step retroactivity analysis, we conclude that the presumption
against retroactivity operates to bar the application of the
South Carolina statute to the claims here.

## B.

Defendants suggest, however, that our analysis seriously —
and unconstitutionally — constricts the proper sphere of legis-
lative authority. In defendants' view, the surpassing intent of
the South Carolina legislature was to express its displeasure
with *Ward I*, undo its effects, and restore the defendants' defi-
nition of "actual charges" to plaintiffs' policies. To fail to
respect this intention, we are told, amounts to a stark assertion
of judicial supremacy. According to defendants and amici
who argue in their favor, the "state legislature is . . . owed def-
erence, not disregard, in its attempt to amend a state common
law rule of construction," Reply Br. of Appellants 10, and the
district court's determination that "*Ward I* [would] trump a
validly-enacted statute by the South Carolina General Assem-
bly that was passed to repeal that very decision . . . upsets our
nation's traditional principles of separation of powers." Br. of
Ronald D. Rotunda as Amicus 8. As expressed above, defen-
dants' view fails to comport with the intention of the legisla-
ture as expressed in the wording of the enactment. And as
explained below, it is defendants' view, not this court's, that
invites the greater constitutional difficulty.

## 1.

The law disfavors retroactivity, *Bowen v. Georgetown
Univ. Hosp.*, 488 U.S. 204, 208 (1988), in part because it
inevitably "raise[s] particular concerns." *Landgraf v. USI
Film Prods.*, 511 U.S. 244, 266 (1994). One such concern is
that of unfairness. *See, e.g.*, *id.* at 265, 271. By attaching new

and perhaps unanticipated legal consequences to past conduct, retroactive legislation threatens to "deprive citizens of legitimate expectations and upset settled transactions." *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 191 (1992).

Another concern is that of unconstitutionality. In many cases, retroactive legislation risks violating those provisions of the Constitution in which "the antiretroactivity principle finds expression." *Landgraf*, 511 U.S. at 266. In the criminal context, for example, retroactive application of penal statutes is flatly prohibited by the *Ex Post Facto* Clause. *See Johnson v. United States*, 529 U.S. 694, 701 (2000). Likewise, in the civil context, retroactive application of statutes potentially implicates the Contract Clause, the Takings Clause, the Due Process Clause, and others. *Landgraf*, 511 U.S. at 266; *see also Eastern Enters. v. Apfel*, 524 U.S. 498, 504 (1998) (holding that retroactive application of a statute violated the Takings Clause); *Link v. Receivers of Seaboard Air Line Ry. Co.*, 73 F.2d 149, 153 (4th Cir. 1934) (noting that retroactive application of a statute potentially violated the Contract and Due Process Clauses).

By limiting instances of statutory retroactivity, the presumption against retroactivity mitigates both fairness concerns and constitutional concerns. Perhaps because retroactivity so often raises fairness problems, courts often explain the presumption's purpose in those terms, praising the presumption's ability to preserve "elementary considerations of fairness." *See Landgraf*, 511 U.S. at 265, 271. Of course a presumption is just that, not an absolute. But as the Supreme Court noted, "[A] requirement that [the legislature] first make its intention clear helps ensure that [the legislature] itself has determined that the benefits of retroactivity outweigh the potential for disruption and unfairness." *Id.* at 268. In this case, for example, applying the statute to overturn the adjudication in *Ward I* would, to say the least, disrupt the legitimate expectations of policyholders who have purchased policies, undergone their cancer treatments, and expected a measure of

reimbursement for those treatments under the adjudicated standard. To upend the legitimate expectations of these cancer patients and upset the prior adjudication of their policies would fly in the face of the presumption, and we see nothing in the South Carolina statute that persuades us the legislature intended to work this sort of retrospective deprivation on its citizens.

Indeed, to ascribe this sort of intent to the legislature would court its share of constitutional difficulties. Courts do not lightly ascribe to legislatures an unconstitutional intent. *See Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 341-56 (1936) (Brandeis, J., concurring). For like the presumption against retroactivity, the doctrine of constitutional avoidance attempts to "giv[e] effect to [legislative] intent, not [to] subvert[ ] it," since it is premised on the "reasonable" notion that legislatures "d[o] not intend [an interpretation] which raises serious constitutional doubts." *Clark v. Martinez*, 543 U.S. 371, 382 (2005); *see N.L.R.B. v. Catholic Bishop*, 440 U.S. 490, 501, 507 (1979); *see also Zadvydas v. Davis*, 533 U.S. 678, 689 (2001); *Mary Helen Coal Corp. v. Hudson*, 235 F.3d 207, 214 (4th Cir. 2000) ("As is our duty, we decline to interpret the statute in a manner that gratuitously raises grave constitutional questions."); *Gold v. S.C. Bd. of Chiropractic Exam'rs*, 245 S.E.2d 117, 119-20 (S.C. 1978) ("When the issue is the constitutionality of a statute, every presumption will be made in favor of its validity and no statute will be declared unconstitutional unless its invalidity appears so clearly as to leave no doubt that it conflicts with the Constitution.").

2.

In this case, the constitutional difficulties do in fact pertain to separation of powers, albeit not in the manner defendants suggest. In cases like this one, in which it is contended that the legislative branch acted not to supplant a judicial ruling prospectively, which it of course may do, but to reverse the

ruling of a particular case, separation of powers concerns are implicated. As Alexander Hamilton warned in the Federalist: "A legislature, without exceeding its province, cannot reverse a determination once made in a particular case; though it may prescribe a new rule for future cases." Federalist No. 81, at 483 (Clinton Rossiter ed., 1961).

Both the U.S. Supreme Court and the South Carolina Supreme Court have acknowledged the soundness of this general rule. In *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 219 (1995), the Court held that the Constitution prohibited legislation from operating retroactively to require courts to reopen "final judgments." The Court reasoned that the Constitution charged the judiciary — and the judiciary alone — with the responsibility of saying what the law is in a particular case or controversy, and once the judiciary does so, the legislature "may not declare by retroactive legislation that the law applicable *to that very case* was something other than what the courts said it was." *Id.* at 227 (emphasis in original).

The South Carolina Supreme Court, in no uncertain language, employs an arguably even more stringent standard, using separation of powers to prohibit the legislature from enacting retroactive statutes that effectively overturn a "prior, on-point judicial decision." *JRS Builders, Inc. v. Neunsinger*, 614 S.E.2d 629, 631 (S.C. 2005); *see also Simmons v. Greenville Hosp. Sys.*, 586 S.E.2d 569, 572 (S.C. 2003); *Steinke v. S.C. Dep't of Labor, Licensing & Regulation*, 520 S.E.2d 142, 157 (S.C. 1999); *Lindsay v. Nat'l Old Line Ins. Co.*, 207 S.E.2d 75, 78 (S.C. 1974). In *Steinke*, for instance, the South Carolina Supreme Court succinctly asked and answered: "May the Legislature by a retroactive amendment overrule this Court's prior interpretation of a statute? We conclude the Legislature may not." 520 S.E.2d at 157. The court explained that because statutory construction is a judicial function, and because "a judicial [interpretation] of a statute is determinative of its meaning and effect," any subsequent law attempting to modify that interpretation cannot apply retroactively with-

out impermissibly invading the judicial power. *Id.* (citation and internal quotations omitted); *see also JRS Builders*, 614 S.E.2d at 631 & n.2.

These cases suggest that the South Carolina legislature's statutory definition of "actual charges" should not blithely be read to contravene this court's earlier judicial definition of "actual charges" for the plaintiffs in *Ward I*. In *Ward I*, we determined that "actual charges" meant the full amount a medical provider billed for its services, and we directed the entry of summary judgment against defendants on liability. *Ward v. Dixie Nat'l Life Ins. Co.*, 257 Fed. Appx. 620, 625-27 (4th Cir. 2007) (per curiam). The defendants now argue that the South Carolina legislature has since come along and said that "actual charges" really meant, for these particular plaintiffs and these precise policies, something else entirely: the lower amount a medical provider actually received as payment for its services. S.C. Code Ann. § 38-71-242. Were we to accept this argument, we would be forced to decide whether the legislature's action was unconstitutional under *Plaut* on the ground that our decision in *Ward I* constituted a "final judgment[ ]." *Cf. Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 219 (1995). Similarly, we would also have to decide whether the legislature's action was unconstitutional under South Carolina law because it overturned a "prior, on-point judicial decision." *Cf. JRS Builders, Inc.*, 614 S.E.2d at 631. That defendants' argument raises these "grave constitutional questions," *Mary Helen Coal Corp. v. Hudson*, 235 F.3d 207, 214 (4th Cir. 2000), gives us reason enough to reject it. Absent a clearer statement of intent, we will not assume that the legislature sought to apply the new rule retrospectively and provoke a fight of constitutional dimensions.

In their strenuous insistence that the South Carolina statute applies here, defendants and their amici argue that federal courts must defer to state legislatures because it is within the power of legislatures to alter common law rules of contract construction, because plaintiffs lack vested rights in non-final

judgments, and because it is within the power of states, not the federal government, to regulate the insurance industry. *See* Br. of Appellants 22, 29; Br. of Ronald D. Rotunda as Amicus 9-10. These propositions strike us by and large as unexceptional, and we do not quarrel with them as general statements. The problem with these propositions is not that they are at all wrong in the abstract but that they all rest on the unwarranted assumption that the South Carolina General Assembly *intended* to apply the statute retroactively to this particular case, thereby undoing the prior adjudicated definition. In this way, defendants attempt erroneously to frame the issue as one about what the state legislature may do, instead of one about what it has done.

As the district court found, however, "[n]othing in either the legislative history or the language of § 38-71-242 unambiguously indicates that the statute is to be applied retroactively." As we already noted, the text of the statute makes no mention of retroactive application, uses the future tense "shall," and includes an effective date. In fact, a legislative committee declined to adopt suggested language that would have declared the statute applicable to any policy that "has been or will be issued." *See* J.A. 1432.

Given the lack of clear legislative intent in favor of retroactivity, we need not decide whether the state legislature *could* apply the statute to this case. Here, the state legislature *did not* apply the statute to this case. And indeed, as far as federalism is concerned, South Carolina courts have been, if anything, even more insistent than federal courts in demanding an unambiguous expression of legislative intent before applying a statute retroactively, a demand motivated in large part by a concern for the proper judicial and legislative roles.

Accordingly, we will not attribute to the General Assembly a constitutionally suspect intent when it has not made any such intent explicit. The framers of the Constitution, having witnessed firsthand the "ruins of a system of intermingled leg-

islative and judicial powers," *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 219 (1995), believed that "[o]ne branch . . . cannot encroach on the domain of another without danger." *Plyler v. Moore*, 100 F.3d 365, 370-71 (4th Cir. 1996) (citation and internal quotations omitted). It takes little enough imagination to project where lodging powers over particular disputes in legislative hands might lead. "Were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control." Federalist No. 47, at 300 (James Madison) (quoting Montesquieu) (Clinton Rossiter ed., 1961). For the foregoing reasons, the district court was right to deflect that prospect, accord the South Carolina statute a sound reading that steers free and clear of any constitutional shoals, and respect this court's prior mandate in *Ward I*.

### III.

Defendants also raise several other contentions on appeal. We shall address them in turn.

### A.

Defendants claim that the district court erred in certifying, and then on defendants' later motion, in not decertifying, the class of statewide plaintiffs in this case. Defendants argue that this was error for two reasons: first, because the "adequacy" requirement of Federal Rule of Civil Procedure 23(a)(4) was not met, and second, because the "predominance" requirement of Federal Rule of Civil Procedure 23(b)(3) was not met.

In considering defendants' claim, we begin by noting a district court's "wide discretion" in deciding whether to certify or decertify a class. *Cent. Wesleyan College v. W.R. Grace & Co.*, 6 F.3d 177, 185 (4th Cir. 1993) (citations and internal quotations omitted). Because a district court possesses greater familiarity and expertise than a court of appeals in managing the practical problems of a class action, *id.*, its certification

decision is entitled to "substantial deference," especially when the court makes "well-supported factual findings supporting its decision." *See Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 434, 421 (4th Cir. 2003). We may reverse such a decision only if the district court abused its discretion. *Deiter v. Microsoft Corp.*, 436 F.3d 461, 465 (4th Cir. 2006). Here, that standard is not satisfied.

Under the adequacy requirement of Rule 23(a)(4), a district court may certify a class only if the class representative "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Defendants claim that because the class representative in this case, Martha Ward, will likely receive enough in damages to offset any increased insurance premiums resulting from this lawsuit, she cannot protect the interests of those class members whose damage awards are so small that they stand to lose on net. The district court, however, did not abuse its discretion in concluding, after a detailed factual analysis, that "[g]iven the identity of claims between the named plaintiff and the class members, there is no potential for conflicting interests in this action."

For a conflict of interest to defeat the adequacy requirement, "that conflict must be fundamental." *Gunnells*, 348 F.3d at 430 (citation and internal quotations omitted). A conflict is not fundamental when, as here, all class members "share common objectives and the same factual and legal positions [and] have the same interest in establishing the liability of [defendants]." *Id.* at 431. Moreover, a conflict will not defeat the adequacy requirement if it is "merely speculative or hypothetical," *id.* at 430 (citation and internal quotations omitted), and in this case, the conflict rests on the uncertain prediction that this lawsuit will cause premiums to increase enough to adversely affect some members of the class.

Defendants also contend that the class action fails under Rule 23(b)(3)'s predominance requirement, which demands that "questions of law or fact common to class members pre-

dominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). According to defendants, individualized evidentiary issues regarding each class member's damage award would overwhelm any issues common to all class members. Once again, however, we decline to find that the district court's careful conclusion was an abuse of discretion. To be sure, individualized damage determinations cut against class certification under Rule 23(b)(3). *See, e.g.*, *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 342-43 (4th Cir. 1998). But the district court did not abuse its discretion in determining that the damage calculation in this case was, at least in one important respect, not individualized. As the court explained, for all class members, damages equal "'actual charges' less amount paid." In other words, the formula for damages was identical for all class members, awarding them the difference between the amount defendants should have paid (the higher amount charged by medical providers) and the amount defendants actually paid (the lower amount accepted by medical providers).

B.

Defendants next claim that the district court erred by awarding plaintiffs damages using explanation of benefit (EOB) statements alone, without also requiring each plaintiff to produce bills from their healthcare providers as proof of "actual charges." Under defendants' view, a proper calculation of damages would require both an actual bill (to reflect "actual charges") and an EOB statement (to reflect the amount already paid).

The bill received by a patient is not the only appropriate evidence of "actual charges." In fact, "actual charges" are evidenced not only by patients' bills but also by EOB statements, in the row labeled "Charge." The district court's decision to use EOB statements to prove damages was therefore prudent. By including both "actual charges" and amount paid, an EOB statement kills two birds with one stone, enabling the calcula-

tion of damages with half the paperwork. A requirement that each class member submit bills as additional proof of "actual charges" would be unnecessary and impractical.

## C.

Defendants next claim that the district court erred in awarding damages to class members who are Medicare beneficiaries, since federal law prohibits medical providers from sending Medicare patients bills showing "actual charges" and instead allows them to send Medicare patients bills showing only the amount received as payment from Medicare. Thus, defendants argue, because there are no "actual charges" in the case of Medicare beneficiaries, there are no damages.

This argument, however, suffers from the same flaw as defendants' previous argument: it, in the district court's words, "place[s] undue significance on the medical patient's receipt of an initial bill." Because "actual charges" are simply the non-discounted value of medical services, they exist regardless of whether the amount is shown on a patient's bill, on an EOB statement, or, in the case of Medicare beneficiaries, on the forms a healthcare provider submits to Medicare in order to get paid. "Medicare summaries show two charges associated with medical services," the district court found, both "the cost a medical provider assigns to its services and the amount of payment the provider accepts as payment for its services." Therefore, Medicare beneficiaries can prove "actual charges" even though "actual charges" are not shown on their bills.

When "actual charges" are understood simply as the higher price associated with medical services, it is clear that there is no good reason to treat class members covered by Medicare any differently from class members covered by private insurance. In neither case do medical providers expect to receive a payment of "actual charges" from patients, since in both cases, patients have other coverage that pays a discounted

amount on their behalf. The fact that privately insured patients, unlike Medicare patients, may see the amount they are not required to pay, is simply irrelevant.

D.

Defendants further contest the district court's reliance on six spreadsheets for the purpose of calculating plaintiffs' damages. Each of the six spreadsheets contained a column reflecting the equivalent of "actual charges," which was derived from EOB statements, and a column reflecting the lower cost already paid by defendants. Five of the spreadsheets were created by defendants themselves in response to plaintiffs' discovery request. The remaining spreadsheet was prepared by plaintiffs' counsel, who used EOB statements provided by defendants to generate the data. On the basis of these six spreadsheets, plaintiffs' damages expert, a certified public account, compiled a final spreadsheet that synthesized the numbers contained in the six spreadsheets and applied an appropriate interest rate to determine the total damages for all plaintiffs in the class. The district court predicated its damage award on the expert's conclusion.

Given the defendants' own role in creating the spreadsheets, it is ironic that they now claim the spreadsheets are unreliable and inadmissible as "double hearsay": "hearsay" because the EOB statements were prepared by insurers instead of medical providers to report medical providers' charges, and "double" because the spreadsheets were prepared by litigants and counsel instead of the insurers who supplied the EOB statements. Thus, defendants claim, the district court should not have permitted the spreadsheets' use in determining damages. In the alternative, defendants suggest that the district court should have required upwards of 500 medical providers to come in and testify as to their "actual charges."

We shall review the district court's decision to accept evidence for abuse of discretion. *United States v. Vidacak*, 553

F.3d 344, 348 (4th Cir. 2009). In this case, the district court did not abuse its discretion by basing its damages award on the data in the six spreadsheets. Under Federal Rule of Evidence 703, plaintiffs' expert was permitted to rely upon certain "facts or data," even if hearsay, if they are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Here, plaintiffs' damages expert did just that, relying upon data contained in the six spreadsheets to form his opinion on the amount of total damages for all class members. When asked directly whether the spreadsheets were of the type "that somebody that is an expert in your area would normally rely on to reach an opinion," plaintiffs' expert answered unconditionally, "[y]es." Defendants did not present any evidence to contradict that testimony. Accordingly, we hold that the district court did not abuse its discretion.

E.

We turn now to defendants' final contention. Defendants argue that the district court erred in declining to offset damages by the higher insurance premiums that plaintiffs potentially would have paid absent a breach. Defendants produced expert testimony that if defendants had been paying "actual charges" as defined in *Ward I* all along, defendants would have charged plaintiffs an extra $2.7 million or so in premiums. According to defendants, it is a fundamental legal principle that a party to a contract should be put in no better a position than it would have been in had the other party to the contract performed its end of the bargain. *See* Restatement (Second) of Contracts § 347; 11-55 Corbin on Contracts § 55.3. Thus, defendants argue, the total damages award should be reduced by $2.7 million.

As an initial matter, we note that this argument assumes that, at the time they entered into the insurance contracts here, the parties understood defendants' contractual obligation to mandate the payment of "actual charges" only in the lower

amount accepted as payment-in-full by medical providers. This claim is dubious, especially since, as the district court pointed out, it "ignores that [defendants] at one time paid benefits according to the higher, fictional amount for the medical services at issue, and that they later began to view the coverage provided by their insurance policies to extend only to the lower amount." If in fact defendants believed they had promised to pay "actual charges" in the higher amount at the outset, then plaintiffs were paying for that promise all along in the form of higher premiums. In such a case, allowing defendants to offset damages would be unnecessary and, as the district court explained, "amount[ ] to a substantial re-writing of the policy." Plaintiffs should not be denied the benefit of their bargain.

Moreover, as the district court also acknowledged, even if we accept the "familiar principle that no party may be placed in a better position by reason of a breach," that principle "is not a license for speculation." Here, we think the proposed damages offset is too largely in the realm of speculation. The district court found that it was far from a sure thing that defendants would have charged higher premiums at all, and even if they had, that the amount of the premium hike was little more than a guess:

> [T]he proposition that [defendants] can look back at their loss experience data, come up with how they would have increased their rates based on that loss experience data, proceed on the assumption that the South Carolina Department of Insurance would have approved the hypothetically requested rate increases [as is required by law], and alter the premium payments under these insurance contracts is . . . speculative.

We see no reason to overturn the district court's determination that the increased premiums were insufficiently certain to justify offsetting damages here.

## IV.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.